May it please the Court. I'm Leonard Powell of the Native American Rights Fund, arguing on behalf of the Plaintiffs' Appellants. I'll reserve three minutes for rebuttal. This case is about whether Indian landowners can sue to protect their rights without having to rely on the government to do it for them. I'll start with the trespass claim and three points in particular. First, there is a cause of action for trespass on Indian trust lands. While the United States owns the fee title to trust lands, the right of possession remains with the Indians. And just as a contrast... You're stating the conclusion of the issue. I thought we're here to argue that issue, that assertion. Well, I don't think the other side disputes that the Indians have the right of possession, Your Honor. No. I think all sides agree that there is a right to possess the land that belongs to the Indians. That's inherent in the issuance of the trust patent. The question then is what rights stem from it? And we maintain that the right to possession includes an inherent right to exclude. That is sort of the nature of the right to possess property. I would put it in sort of personal terms to try to illustrate the point, Your Honor. Respectfully, imagine if someone were to go into your own home and they were to refuse to leave. Functionally, you would be deprived of your right to possess that land unless you had the ability to exclude that person. And it's the same thing here. It's the right to exclude others from it. And we see that going far back in our common law tradition. For instance, there's the Miller case from the Pennsylvania Supreme Court. That doesn't decide this case. I mean, we went through all that the first time around. And we suggested an analysis that you obviously disagreed with. I can't remember if there was a petition for re-earring and bank. There certainly wasn't an interlocutory petition of the Supreme Court. For review of the analysis in the first case. So I don't report to know, you know, obviously, Your Honor's own opinion better than you do, Judge Logan. I understood the issue to be left open by your opinion, in part for significant reason, because the panel. District Court decided it. And now we appeal, of course, the district court's new decision. And now we have the views of the United States, which I think are an important part of how this time around is different from the last time. Of course, the United States completely agrees with our position. They agree that we have a right of action and that it's federal. I think that is where there's more of a disagreement with the other side. Counsel, isn't the key issue here for whether or not there's a federal common law cause of action, whether the U.S. has a continuing interest in the property? I agree that's a key question. And here there is that continuing interest because the United States owns the fee title to the property. So that's what we see in the Wilson case. I would say that's what we also see in 0901. The key passage, in my view, from 0901 is the passage that notes that the assertion of a federal controversy is not enough for there to be a federal cause of action when it is derived from a federal grant, the title whose scope will be governed by state law. But that's not the case here because the United States has not yielded its interest. In that type of case, as Wilson makes clear, the Indian right to the property depends on and is protected by federal law, wholly apart from state law. And Congress has actually confirmed that three times over by statute. It's done so in 25 U.S.C. Section 349 in the North Dakota Enabling Act and public law 280, all of which make clear state law cannot determine the right to possession of state land. So the remedy here has to be federal. And then I would say, Your Honor, the third key question when it comes to this trespass cause of action issue is whether the Indians can assert it on their own behalf. As to that issue, again, the answer is yes, the Indians can. Again, the right to possess the land ultimately belongs to the Indians, even if the United States holds the title. That means this right to exclude belongs to them as well. Counsel, what do you make of the distinction that the case has described between the rights of those who are Aulottese and the rights of tribes who have aboriginal land? So I think the main case, the two cases from this court to address that issue are Wolfchild and, of course, the previous decision in this case. And those sort of grappling with Taylor where restricted fee land was not enough to give rights to a cause of action. So I'll start with Taylor and then move through. As to Taylor, that was just a mere application of the well-pleaded complaint rule because in restricted allotment, there has been a grant of the fee simple to the Indian and any remaining federal cause of any remaining federal protection is just asserted as a defense. Well-pleaded complaint rule, that can't get you into federal court. But with trust allotments, it's different. Again, the United States retains the title. And so the Indian right to possession continues to be protected by federal law. As to Wolfchild, you know, in case one, this court noted. What type of allotments are we dealing with in this case? Here we are dealing with trust allotments where the United States continues to own the underlying land and holds it in trust for the Indian beneficiaries. Now, the source of that is statutory. Yes, the Allotment Act. Not aboriginal. That's correct. An Indian allotment can have aboriginal title. But here we are asserting based on the Allotment Act and then the Indian Reorganization Act. The Allotment Act placed a restriction on the lands initially that would last for 25, sorry, when the lands were initially allotted. Your brief and the government's brief, astonishingly, say that there is no valid distinction that the aboriginal versus delegated source of the right is irrelevant. And you say specifically Wolfchild is of no moment, just as you argued the first time. And we suggest to the contrary. Now, where do you get from Oneida 1 and 2 that the analysis in our prior opinion that that is a distinction that the Supreme Court has carefully recognized and preserved is invalid? It never happened. So I see. You either don't read or you don't understand or you just disagree and won't admit it with the Supreme Court or with our interpretation of the Supreme Court. So, again, you know, I am not going to pretend to better understand your own opinion than you do, Your Honor. I will tell you that what I get when I read these cases is. These cases versus our opinion, which is law of this case. Chase 1 is the law of this case. And it was applied very carefully by the district court. I don't. You just come up and repeat the arguments we rejected the first time and say the district court got it all wrong. And the next day, the Department of Justice comes in and agrees, obviously, in collaboration on this. So the BIA, I don't think ever addresses it. I would make, I can't speak for the Bureau of Indian Affairs, but I'll make two points about these cases. The first is as to Oneida, the focus on aboriginal title in that case stemmed from the fact that it was unclear whether that was enough of a federal possessory right. If you read the first paragraph of the analysis of Oneida 1, the court, the Supreme Court there says that the threshold allegation required of such a well-pleaded complaint, the right to possession was plainly enough alleged to be based on federal law. And then the rest of that opinion focuses on, well, OK, is this aboriginal title actually a federal right? Part of the reason the Supreme Court reached that determination was because the aboriginal title had been confirmed by treaty in that case. If you look back at the concurrence by Justice Rehnquist joined by Justice Powell, that concurrence suggested that actually aboriginal title in the abstract might not have been enough and that the confirmation by treaty was really central to why there was a claim. So I think what that shows is actually as a matter of first principles, it's easier to show the federal cause of action when you have a statutory or treaty, some sort of congressional grant of the authority, as opposed to Indian title, which is in some ways kind of foreign to U.S. law. It predates the founding and it had to be incorporated into U.S. law. So that's why the Oneida cases had to grapple so much with the nature of aboriginal title. And as to Wolfchild, that case starts by discussing aboriginal title versus allotment. But then the second part of Wolfchild's analysis turns to whether there was whether the Indians in that case could seek a declaration of possessory rights under the 1863 Act that was at issue there. And Wolfchild ended up saying, because the Indians are not entitled to a declaration of the exclusive right and title of the 12 square miles under the Act, those Indians have no property rights upon which to base federal common law claims for ejectment and trespass. So that line suggests to me that Wolfchild didn't view aboriginal title as the only mechanism to showing a federal common law claim, that if you could show some other federal right of possession that continues, you could still bring that claim in the court. And I think that Andover's position here is actually quite remarkable. I don't see how the allottees are supposed to move forward if they can't bring this claim. It's I think it's quite clear state law cannot apply. The statutes I referenced earlier, like Public Law 280, just prevent states from determining the right to possession. So there needs to be a way forward here. And not if federal law makes BIA your exclusive representative in court. So I think that's what BIA has a claim pending that's seeking relief on your client's behalf. And the ultimate underlying issue here is whether that is is the exclusive protection you have under federal law, not whether you have none versus what you're claiming. So I think that this is what Pope Vividi speaks to. At the end of Pope Vividi, I think there's a very enlightening line. This is at page 372 of the opinion. And the court essentially says that the Indian landowner, like other property owners, can maintain suits appropriate to the protection of his rights. So I read Pope Vividi as establishing a default rule that if it's a claim. Were they addressing a federal common law trespass claim? It was a breach of lease claim. But that line speaks in terms of suits more generally. So I take from that a principle that if it's something an ordinary landowner can assert, then it's something the Indian beneficiary can also assert without having to rely on the United States. And, you know, of course, the United States itself agrees, citing Pope Vividi, it explains that it just is unable to enforce the possessory rights of the thousands upon thousands of Indian latis out there. But it's not as much as there's millions of acres of this land. Possessory rights. We're talking about millions of damages for a trespass. That stems from violation of the right to possession, Your Honor. And we also seek ejectment because. Well, now you're into state law. Ordinarily, we certainly would be, Your Honor. But because of the principle announced in cases like Wilson, where the U.S. right continues, sorry, the U.S. interest continues, state law doesn't apply. And because of specific statutory grants like public law 280, we can't go into state court. This is this is where we are left. And I think this case is a stark illustration of the problems with trying to rely on the United States as the trustee. The United States didn't even alert us to this trespass until after five years had passed. It's now been the trespass has been ongoing for over 11 years, which is more than half of what the term of a new 20 year lease would have been. And we filed this claim over six years ago. The United States waited until after we filed before they filed. And meanwhile, their claim isn't even going forward because the district court has insisted on staying. Is there an underlying negotiation for continuation of the easement agreement or is it just complete? No, we we want no nobody on this land. There have been negotiations periodically throughout the case. The district court moved forward to decide this issue after the most recent negotiations between our group of allottees and Andover broke down. There are other groups of allottees represented by other counsel, such as there's an appeal where other allottees have sought intervention in Tesoro, the related case. I can't speak for what it is. Could you describe more, I guess, in a concise manner, the relationship between this case and Tesoro and the 28-J that's been submitted in this case concerning Tesoro? Yes, Your Honor. So Tesoro arises from the BIA's attempt to also address this claim administratively. The BIA's most recent actions are the subject of an APA challenge that Andover, Tesoro, sort of a group of companies have brought. And in that case, the United States has also asserted the same counterclaim that we assert. But the United States claim has been stayed because the district court deemed the validity of that claim as sort of turning on the validity of the underlying district court actions. If I may, I'd also like to speak about the third, the easement issue and the breach of that before my time expires. On that score, the only meaningful argument that Andover is asserting is that we excuse me, that the claim should be dismissed because the United States is purportedly an indispensable party. Now, 90 percent of the time, that is the rule. And that's what this court recognized in Chase 1. But 10 percent of the time, roughly, there's an exception. The 90 percent of the time rule exists because ordinarily suits involving Indian lands seek to alienate or condemn those lands, and that threatens U.S. interests. But in the case of suits by tribes, that's or Indians to vindicate their rights. That's a well-recognized exception. There's no threat to the U.S. interests. So that sort of suit can proceed. Why doesn't the U.S. have an interest in this easement if they granted it? So we don't dispute that there is an easement, but the inquiry in the first instance is on whether the interests are threatened. And we maintain our suit doesn't threaten those rights, that it vindicates those rights. Of course, the United States, in its amicus brief, agrees with that position. They don't think they need to be a party to the claim. They don't see their interests at stake. And I would maintain they're the best judge of their interests. But you're saying there's a distinction between an impact that threatens the rights and an impact that merely impacts the rights in one way or another? Yeah, there's no, it doesn't threaten when you're seeking to enforce federal law. I understand the test to be threatened. And that's what I see in this case's, this court's decision in Spirit Lake and in Bird Bear. I think that's the underlying rationale of post-mobility. It's hard to understand why that suit could proceed if the U.S. was an indispensable party. Really, I only see one case that's ever suggested another outcome. That's the Havasupai case that they cite. But that was a very odd situation where the tribe was claiming water rights to hundreds and hundreds of miles of land. So it went far beyond the narrow tract of land that normally is at issue in these types of cases and brought about broader U.S. interests in property that's far afield from sort of Indian enclaves. We don't have that sort of situation here. We're talking about, I think it's 37 allotments. And because, and also, of course, our rule is reinforced by the common law because third party beneficiaries can ordinarily sue to enforce a contract without including all the parties. So I think it'd be pretty radical ground, to be honest, for the court to dismiss that claim on that ground. I'll reserve the remainder of my time for rebuttal. Thank you, Your Honor. Mr. Emery. May it please the court. My name is Mark Emery. I'm here on behalf of the Appalachians. I'd like to use some of my time this morning to offer the court a brief roadmap of the several issues in this case. And that roadmap divides up the issues into two different groups. And I'd submit that either of those groups provides a map, a direct map to affirmance of the district court's decision. The first group would focus on the threshold allottees claims. The first, the fundamental question in this group would be, what do these individual trust allotment holders need to claim for a claim in trespass or breach? The issues would be... Federal claim. The federal claim, yes. The issues here, of course, would include, first of all, whether they can sue in federal common law. And we think that we agree with the court's reasoning in case one. We think that the district court very carefully and thoughtfully applied and extended that reasoning. And it's just a court decision to draw the relevant decisions between Oneida and Taylor. And critically, the distinction between the Oneida one case draws between the aboriginal rights that tribes seek and a case like Taylor versus Anderson, which involved individual allottee claims under patented land. Let me ask you about Wilson. Wilson versus Omaha Indian tribe. The U.S. Supreme Court found a federal common law claim where the government had never parted with its title and interest in the property continues. Why isn't that the case here? I'm sorry, can you repeat just the last part? Why isn't that the case here, where the federal government has never parted with its interest in the property and their interest continues? And in that case, they found a federal common law claim. Because this goes right back to the heart of the Oneida case and the distinction that Oneida draws between an actual common law right, which is what tribes possess to their aboriginal lands from time immemorial, and the case that was in Taylor versus Anderson, where you have a statutory allotment, an individual allottee who wants to make a claim under common law is protected by a statute, right? Like the petitioner in Taylor v. Anderson had an allotment that was under government protection. That's exactly the same situation that the allottees here have. In Anderson v. Taylor, or Taylor v. Anderson, it was a restricted allotment. Here, it's trust allotments, but there's materially no difference between these two. These are two patents. And the result of when a patent issues to an allottee is that while it's still... Here, there was no patent. It's a trust allotment. No, there is a patent issued. Even when there's a trust allotment, there's a patent that issues. Not in fee? Not in fee, no. Here, it's sort of delayed indefinitely when it would be in fee. In most cases, either whether it's a restricted allotment or it's a trust allotment, eventually, at some time barrier, it'll turn into fee simple. But it just varies greatly. So, is it your position that allotments in fee are treated the same as allotments in trust? For purposes of federal common law, causes of action? There can be some technical differences because an allotment in simple fee is actually just completely converted to Indian ownership. But the fact, and this is what the Oneida One distinction in Taylor v. Anderson draws out perfectly. The fact that an individual allottee has an allotment, whether it's the trust allotment here or the restricted allotment there, doesn't make a difference in terms of asserting a common law claim. Even though the allottee in Taylor was under the government's protection still, the Supreme Court held that they could not state a federal common law claim because it just simply wasn't enough. It wasn't enough to make that claim. So, just having that kind of contact with federal law is insufficient to meet the test for arising under jurisdiction under 1331. But to continue on with the roadmap that I had, so the first issue would be the federal common law land and whether there are any other bases for jurisdiction such as 1345. But we think that the answer here is no. That Oneida makes it clear that when a patent is issued, as it says, once patent issues, incidents of ownership are, for the most part, matters of local property law to be vindicated in local courts. And in such situations, it's normally insufficient for arising under jurisdiction merely to allege that ownership or possession is claimed under a U.S. patent. That is our case. That is our situation. So, there's not a basis for a federal common law claim here. And if the allottees are going to proceed with a claim for trespass, it would have to come under state law, assuming there was not some other barrier to doing so. Both the U.S. and the allottees speak on the Pofabitty case, and we think that's the relevance here. Pofabitty was a case involving state law that arose in state court. The U.S. did not take action in it. The Supreme Court ended up saying that and remanding back to the state court for the allottees' claims to continue there. However, here's where I describe this as the first column with a focus on the allottees' claims. The second claim would involve what I think was a particular interest of the court in Chase 1 and that it was looking for answers on. And that is, what does the whole body of right-of-way law and both the right-of-way statute and the regulations mean for the potential claims at issue here? And second, the practical developments surrounding the big event that's happened in this case since Chase 1, which of course is that the U.S. has brought a trespass claim in the Tesoro litigation. Both of these things have significant consequences. And if the court were to recognize that allottees can bring any kind of claim, whether it's a common law claim or state law claims for trespass, any of those claims would still need to survive what I call the column B gauntlet, right? Which is to, they would need to demonstrate that the allottees can bring a claim under the Right-of-Way Act and the relevant regulations. And then second of all, that there wasn't some reason provided by the Supreme Court's Heckman decision, which provides a kind of claim disposing rule that's highly relevant here since the United States has taken the lead and filed a trespass claim. So to touch on each of those issues briefly. First of all, this case, the core of this case is that it arises from a holdover from a right-of-way. And we know that this is an issue that Congress has spoken specifically on in the Right-of-Way Act. It's provided that right-of-way holdovers are to proceed through a process of consent with the BIA working directly with allottees. And then second of all, that the BIA can promulgate regulations, which it's done to provide an extensive framework for how regulations or how the consent or renewal process can proceed. Counsel, how does this help us resolve the question of whether there's a federal common law right for the allottees to vindicate the rights that they assert? That's why I'm laying out this roadmap, Your Honor, because I see what you just asked, that's a primary first question that needs to be answered. So, you know, for the reasons that I argued here and can argue in greater depth, we think this case is just like Taylor v. Anderson and that the allottees are simply not able to bring a federal common law claim. If they could, or if there's some state law ground, then we go to column B. What's your concise statement as to why they can't? I mean, conceptually, it would seem to make sense that if you've got rights under federal law, that you would have access to federal court to be able to vindicate those rights. The Supreme Court has said exactly the opposite. That's what an 801 says. It says, if you want to know what the common law right is, we're telling you. It's the claim that a tribe can bring based on its aboriginal title. But when we're talking about individual allottees, even though they clearly have contact with federal statutes through the allotment process, once they are issued a patent, they're not a tribe anymore. They can't benefit from that same common law right. What kind of a patent are you talking about? The patent that is undisputed that all the allottees have here, which is a trust allotment. So we're not saying they don't have... I think the Supreme Court dealt with that previously. Yes, they did. That's exactly what 801 dealt with. And as I explained, the claims that the Taylor v. Anderson allottees had are materially the same as the trust allotment claim that the allottees here have. So I think the court, I think this court in Chase 1 realized that that was the avenue I had to take. I think the district court took it. And I think that provides fully adequate grounds to dismiss that claim in this court. But to continue with the right-of-way issues, the court is familiar with the regulations that the BIA has promulgated in dealing with holdovers. And a critical part of that is 25 CFR 169.410, which provides, first of all, that the BIA needs to work through a consent process with allottees. And if it determines that right-of-way renewal cannot occur, then the BIA has the discretion to declare a trespass. It also has, again, under the same regulation, the discretion to proceed to seek remedies in a court. Okay, when Chase 1 was decided, they hadn't done that yet. Now they have. They filed the counterclaim in the Tesoro litigation. And that really changes this case in critical ways. I would note here that the allottees have relied on a separate regulation, 25 CFR 169.413, which, as the court discussed in Chase 1, works in a different way. It seems to provide a statutory basis, but it's not directed to the holdover situation. It might provide allottees some basis to seek a remedy in a different case, but not in this case. Here, the United States filing of the counterclaim changes many things under the Heckman decision. Okay, and Heckman was a case where the U.S. was pursuing invalidation. What's this case again? Heckman v. United States. It's a 1912 Supreme Court case. The case was discussed briefly in the district court's decision, and we've also briefed the issues here. Heckman involved suit by the United States to seek invalidity of certain conveyances, illegal conveyances of allottee property. One issue that was raised in a demur in the case was whether the U.S. could proceed to go forward without the allottees who had essentially performed the grants that they were trying to invalidate. They asserted that without the allottees in the case as parties, that the U.S. couldn't go forward. The Supreme Court resoundedly rejected this position and said not only that the United States can go forward with the case on its own, but that the allottees, and this is looking at on page 445, 446 of the decision, that the allottees could not take the contrary position, and even though they did not need to be in the case and actually couldn't be in the case because they were precluded from bringing another suit, they would still be bound by the decision when it's brought by the United States. That's the decision we have here, and that's why the U.S.'s counterclaim changes everything. Heckman says in particular, page 444, there can be no more complete representation than that on the part of the United States enacting on behalf of these dependents whom Congress, with respect to the restricted lands, has not yet released from tutelage. The efficacy does not depend on the Indians' acquiescence. Again, that's just the situation we have here, that the United States is bringing the suit, the allottees want to be involved, but Heckman said not only they don't need to be involved, they can't be involved in this kind of a situation. So one thing that you can notice from this is that on page 26 of the U.S.'s amicus brief, the last argument they make is that the allottees' claims in this case should be stayed. Why? They cite Heckman. That's the rationale, because they have already brought the case here. They argue that there should be a stay instead of a dismissal. We, of course, have the arguments that I've already made for why it should be dismissed rather than stayed. But still, you can see that even the United States has adopted the rationale here that Heckman changes this case and that the allottees don't need to be in the case and don't have a basis for doing so. This underscores also the number of practical issues that arise from the allottees trying to pursue relief in these cases at the same time that the United States is doing so. The consent process of trying to renew a right-of-way is an extremely difficult one. It seems to me, as I read the appellant's brief, they distinguish it. They say that Heckman only said that the United States can preclude actions by allottees after the United States has reached judgment, as opposed to... And then they say Povkabidi is support for the notion they can join in. Well, so joining in here, this was actually the point I was just going to get to here. I thought that's what we were discussing. Yeah, they've argued based on Heckman that the case should be stayed because the allottees don't need to be involved. Whether there's a technical preclusive effect at the end of a judgment for the government is a different thing, but the Heckman decision itself... Let's see if I can find the language. Yeah, this is Heckman at page 446. When the United States itself undertakes to represent the allottees of lands under restriction, again, that's our situation here, and brings suit to cancel prohibited transfers, such action necessarily precludes the prosecution by the allottees of any other suit for a similar purpose relating to the same property. Okay, so the Supreme Court has said it precludes the allottees' ability to bring a suit once they've done it. And again, to underscore, there's a rationale for why these regulations work this way, why the holdover process works this way, and why Heckman sort of slots right into this case in this particular way, now that the U.S. has filed the suit that the allottees have been wanting to bring. If the court hasn't looked at it, I would commend even just taking a look, a short look at our complaint that we filed in the Tesoro case, because it goes over in very, very close detail the entire decade-long process that we've gone through to try to get this right away renewed. And the particular sticking point is that even after you agree to sort of the value of the land and such on all of the different tracts, you have to get majority consent in all the allotments. The vast majority of the 412 allottees here did sign on to the agreement that we had going. There were only five tracts where there wasn't a majority consent. But that scuttled the entire thing, you can't run the pipeline if there's even one tract that is holding out. So that is the reason why in a case like this, the regulations allow for only the U.S. to go forward and to bring the claim and why Heckman would push these other claims to the side. Is that fundamentally a monetary dispute or are there other factors playing into the? I'm glad you mentioned that, Your Honor, because yeah, it's fundamentally monetary. Although we would stress that here, it's a pipeline trespass with a lot of money at issue. But the underlying common law claim that the allottees want could be brought for like a dog running and digging up the neighbor's bushes, right? I mean, once you give them a federal common law cause of action like this for trespass, then they can use it for whatever trespass they want, right? But it's important to stress that there's that ramification that I don't think the court should be going to create new common law when the Supreme Court has said so many things to the contrary. But finally, that allowing the allottees to proceed just in the same way that the U.S. would cause massive confusion. I see my time is ended. There are no further questions. Thank you. Thank you. For rebuttal. Thank you, Your Honor. I'd like to make four quick points and rebuttal. First, Judge Graz, you were absolutely right to focus on the type of patent at issue. Oneida recognizes that ordinarily when patent issues, matters become part of state law. But that's not the case with trust title. There's a clear distinction in the law. We see that in 25 U.S.C. section 349, expressly distinguishes between the two. We see that in Wilson recognizes U.S. interest continues. State law isn't let in. And I think it's important to keep in mind, you know, these rules are written in respect to the broad rules that apply for land of the West. Almost all land of the West was derived from a federal grant at some point. So of course, state law has to come in to govern that law, that land after the U.S. relinquishes its interest. Otherwise, we wouldn't have state property law in the vast majority of this country. But here, we're not talking about that type of land. We're talking about land that the U.S. has never let go of and where the federal, where the right of possession continues to be solely determined by and protected by federal law. And I'll note real quick, you know, the, Andover tries to play some- I'm not sure that categorical assertion is fairly reflects allotment law over the last century or the century it was, it changed so often. Well, I don't, Your Honor, that, you know, he, the Andover notes, you know, oh, well, the trust- You said the U.S. government has never relinquished its title. Well, that was the whole purpose of the Dawes Act. But then the- It didn't bear, it didn't come to fruition. Then the IRA ended up reversing that. And so U.S. relinquished, interests weren't relinquished. And of course, tribes have brought these suits all the time, including cases where there is no aboriginal title, like the Bad River Band case and the Colvard case from the 1930s. As to the right-of-way regulations, the U.S. has told us 410 is not what governs here, 413 is. That deserves our deference. As to Heckman, as you noted, Judge Logan, that's claim preclusion. There's the previous paragraph in that opinion notes, for instance, that it's the decree that binds the Indians, not the mere action. And no case has ever ruled that way. And then I would note that we had an offer for $35 million we were prepared to accept as terms of how this went. Can I ask a question? Do you agree with Mr. Emory's characterization of the nature of the allotments in Taylor? I, I, I, I, could you clarify which part of the characterization? What type of allotments in Taylor versus Anderson? What were they dealing with there? That was an allotment that was restricted fee. So the fee patent had been issued as opposed to... And they just restricted alienation for a period of time. But it was an allotment in fee, not in trust. As opposed to when trust allotments, the trust will expire at some point unless Congress acts. But then a new patent, a new fee patent has to be issued when the trust period expires. And Congress ended up sort of reversing policy in the Indian Reorganization Act. I see my time has expired. If there are no further questions, we submit that the district court should be reversed. Thank you. Thank you, counsel. Case has been thoroughly briefed and the argument's been helpful. It's very complicated. We'll take it under advisement.  Please call the next case. The next case for argument is United States v. Ronald Byers et al.